# Wytheville.

## LAVENSTEIN BROS. V. HARTFORD FIRE INSURANCE COMPANY.

### June 12, 1919.

1. FIRE INSURANCE—*"Iron Safe Clause"—Sufficiency of Inventory.*—
   A fire insurance policy required that the assured should take
   a complete itemized inventory at least once in each calendar
   year. The inventory of assured taken February 1st did not in-
   clude purchases made during the preceding January, and,
   therefore, technically and literally speaking was not a complete
   itemized inventory of stock on hand as was required by the
   "Iron Safe Clause" of the policy of insurance, *quoad* such goods.
   The purpose, however, of the "Iron Safe Clause" in insurance
   contracts is to preserve evidence of the actual existence of the
   property insured, or from which actual existence may be veri-
   fied; and as the assured preserved the invoices of all of the
   January purchases in an invoice book and they were subse-
   quently furnished to the insurance company, together with the
   books of the assured showing such purchases and the items
   thereof in as much detail as if they had been entered on the
   inventory, the books and invoices must be taken to be a sub-
   stantial compliance with the "Iron Safe Clause" requirement
   of an inventory, so far as such January purchases are con-
   cerned.

2. FIRE INSURANCE—*"Iron Safe Clause"—Substantial Compliance.*—
   Substantial compliance with the "Iron Safe Clause" in fire
   insurance policies is all that the law requires. A literal com-
   pliance is not essential.

3. FIRE INSURANCE—*"Iron Safe Clause"—Itemizing.*—The inventory
   of assured did not contain the stock numbers of the items of
   goods or other data touching the identity of the items in order
   that such items could be traced to former inventories, or to in-
   voices of them, so as to ascertain whether the company was
   being charged with old or new, out of style or shelf-worn
   goods, or at original cost prices. As there was no provision
   in the policy of insurance requiring such description in the
   inventory, it was unnecessary. The policy required only a
   "complete itemized inventory of stock on hand" at the time of
   the inventory, and any description, which is sufficiently detailed

to evidence that it is an actual inventory by items of goods found thereby to actually exist at the time, complies with such contract requirements.

4. FIRE INSURANCE—*"Iron Safe Clause"—Inventory.*—The actual existence of the goods at the time of the inventory, as found by an actual inventory, taken in the usual course of business, for the *bona fide* purpose of ascertaining actually existing goods and their values at the time, as contradistinguished from a mere estimate or opinion on the subject, is the essence of the contract provision that the assured shall take a complete itemized inventory of the stock on hand.

5. FIRE INSURANCE—*"Iron Safe Clause"—Grouping Goods.*—Where insured was required to take a complete itemized inventory of stock on hand, the inventory is not invalid because in many cases it aggregated goods which were of different kinds, such items giving the number of yards of dress goods, at a certain price per yard. The goods were not all of the same kind of material, but were of the same value per yard.

6. FIRE INSURANCE—*"Iron Safe Clause"—Lumping Goods.*—Objection was made to some entries on an inventory that they "lumped" goods, such as "1 lot jewelry, $10.00," but such entries were few in number and could not be said to evidence any lack of actual inventory of goods existing at the time, or to be unreasonably lacking in detail, considering the large stock of goods inventoried.

7. DOCUMENTARY EVIDENCE—*Objections to Admission — Made for the First Time on Appeal.*—Objections to the admission in evidence of an inventory required by a policy of insurance, made for the first time on appeal, come too late, and must be treated as waived. Such objections in the trial court, had they been made there, would have put the assured upon notice that strict proof of the entries on the inventory was insisted upon, and would have given an opportunity to the assured to supply the evidence with respect thereto which the rules of law in such case would have required. The record does not show that such evidence could not or would not have been supplied if any issue requiring it had been made in the trial court.

8. FIRE INSURANCE—*"Iron Safe Clause" — Inventory Taken at a Branch House of Assured.*—A clause in a policy of insurance on a stock of goods of assured in a certain city, requiring the assured to take and preserve an inventory once a year, did not require assured to preserve their inventory taken at a branch house of the assured in another city, the branch house being a separate business entirely.

9. FIRE INSURANCE—*"Iron Safe Clause"—Shipments from Branch House.*—A policy of fire insurance provided that, "the assured

will keep a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases sales and shipments, both for cash and credit, from date of inventory." The assured maintained several branch stores from which goods were sometimes shipped to the main store, upon the stock of goods of which the insurance was taken out. When such shipments were made to the main store they were entered on the books of the assured as purchases. These books showed the details of the items of such goods, and there were invoices of them by the branch stores, showing the same details. These invoices were preserved and delivered to the insurance company and verified the books as to such details.

*Held:* That these transactions were certainly shipments to, if not, accurately speaking, purchases of, goods by the assured in its main business. The "Iron Safe Clause" concerned only the inventory of the main business, the goods in that business being the goods which were insured, including "shipments" to it as well as "purchases," and it cannot be construed to extend to the inventory of another business owned by assured merely because such inventory would furnish additional evidence of the correctness of the books of the assured.

10.  FIRE INSURANCE—*"Iron Safe Clause"—Books of Branch Houses.*—Where the stock of goods of one only of a number of stores of a party is sought to be insured, the insurance company may stipulate in the iron safe clause, or elsewhere in the policy, that such other books shall be kept, besides those covering the particular business in which the stock of goods is sought to be insured, as it may choose to require. But in the instant case, the business of which the books, required by the iron safe clause of the policy in suit, were to present a complete record, was the business of the assured at its main store, and not its business conducted at its branch houses in other cities.

11.  FIRE INSURANCE—*"Iron Safe Clause" — Sufficiency of Books Kept.*—In an action upon an insurance policy an expert for assured stated that the books of assured "clearly and plainly present a complete record of the business transactions, including the purchases, sales, and shipments, both for cash and credit, from the dates of the respective inventories there and up to the time of the fire." This testimony was ample to have sustained a verdict of the jury finding that the books fulfilled every substantial requirement of the iron safe clause, and the fact that the insurance company had the books in the hands of an expert accountant for six or seven months and did not put such expert on the stand, or any other expert to assail the sufficiency of the books to comply with the iron safe clause, is convincing evidence in itself of the sufficiency of the books.

12. FIRE INSURANCE—*"Iron Safe Clause"—Profits of Business.*—
Where there was ample evidence before the jury to warrant
them in holding that the percentage of profits included in the
claim of the assured was conservative and fair in amount, as
ascertained from the actual business transacted by the assured
in the year preceding the fire, as shown by the books and other
evidence for the assured, the books are sufficient. The books
were not intended or expected to record the profits made, nor
the discounts which might have been, but were not, received;
but they did record all the data needed for the ascertainment
of such matters.

13. FIRE INSURANCE—*Incumbrance of Property.*—A note of assured
was in the usual form of a negotiable collateral security note,
and, after the obligation to pay, contained the following pro-
visions: " * * * Having deposited as collateral security for
the payment of this and any other liability of ............ to
the holder hereof, now due or to become due, or that may
hereafter be contracted, the following property, with authority
to use, transfer, or hypothecate said collaterals: * * * lien
on all stock, fixtures and accounts, etc., in our stores, 31-33
Sycamore St., City, (8367) the market value of which is now
$................., with the further right to call for additional
security in case there should be a decline in the market value
thereof. * * *." The designation 31-33 Sycamore St.,
City, correctly describes the place of business of the assured
in Petersburg.

*Held:* That the note and the provisions thereof were plainly in-
sufficient to create a chattel mortgage; nor did it create a lien,
and, no lien having been created, or intended to be created,
the doctrine of equitable lien or mortgage cannot apply. So
that there was neither a legal nor an equitable incumbrance
created by the assured on the subject of the insurance after
the policy in suit was issued; far less an incumbrance by chat-
tel mortgage; nor did this note prevent the ownership of the
assured of the subject of the insurance from being "other than
unconditional and sole ownership." Even if the writing in
question had created a mortgage, that would not have deprived
the assured of the "unconditional and sole ownership of the
property conveyed."

14. FIRE INSURANCE—*False Swearing.*—False swearing to forfeit an
insurance policy must consist in an oath to statements know-
ingly and willfully false or recklessly made.

Error to a judgment of the Hustings Court of city of
Petersburg in an action of assumpsit. Judgment for de-
fendant. Plaintiffs assign error.

*Reversed.*

This action was instituted by the plaintiffs in error (hereinafter referred to as the assured) for the recovery of the sum of $2,500, the amount of fire insurance provided for in a policy of insurance issued to the plaintiffs by the defendant in error (hereinafter referred to as the insurance company).

The policy was issued on September 19, 1913, for a period of one year on the "stock of general merchandise, consisting chiefly of millinery, dry goods, notions, fancy goods, hats, caps, boots, shoes and all other articles of merchandise not more hazardous, while contained in" a certain store designated in the policy, occupied by the assured in Petersburg, Va.

The fire occurred on November 26, 1913. At the time of the fire the assured had other fire insurance on said stock of goods, the whole, including the policy in suit, aggregating $80,000, all of which insurance was permitted by such policy.

The policy is in standard form of the usual fire insurance policy and contains the usual iron safe clause which embraces (among others) the following provisions of warranty:

"1st. The assured will take a complete itemized inventory of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within thirty days of the issuance of this policy, or this policy shall be null and void from such date * * *."

"2nd. The assured will keep a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit, from date of inventory as provided

for in first section of this clause, and during the continuance of the policy."

The policy, in other parts of it distinct from the iron safe clause, contains also the provisions that it shall be void "if the subject of the insurance * * * be or become encumbered by a chattel mortgage, * * * or if the interest of the insured be other than unconditional and sole ownership * * * or in case of any * * * false swearing by the insured touching any matter relating to this insurance or the subject thereof * * * after loss."

By its pleadings in the case, the assured claimed that they had complied with said iron safe clause by their inventory taken of the stock of goods in said store, as of February 1, 1913 (which, however, did not include the purchases made in January, 1913), and by the books which it kept as a record of its business transacted at such place of business from February 1, 1913, to the date of the fire and also of said January, 1913, purchases.

By such pleadings the assured claimed that the total sound value of its stock of goods on hand at said place of business covered by the insurance policy in suit, which were burned or injured in the said fire was................ $95,834.20

Less the amount of salvage of goods not destroyed by the fire, as mutually agreed on... 10,000.00

_____

$85,834.20

And less aggregate of items of goods on said inventory not itemized thereon, except as "lot" of this or that character of goods, for which the assured claimed no compensation....... 3,102.10

_____

Leaving net balance total loss claimed......... $82,732.10

By its pleadings, the insurance company took the follow-

ing positions of defense to the action, which are material upon the assignment of error, namely:

1. Not that no inventory was taken or that no books were kept, as required by the iron safe clause; but that (a) no "complete inventory" of the stock on hand "was taken or furnished the insurance company, as required by the iron safe clause, and that' (b) the assured "did not keep a set of books which clearly and plainly present a complete record of the business transacted by them, including all purchases, sales and shipments, both for cash and credit," as required by the iron safe clause.

2. That the inventory made by the assured in 1913, preserved and furnished the insurance company, was not the original inventory so made.

3. That subsequent to the issuance of the policy in suit, to-wit: on October 14, 1913, the assured encumbered the stock of goods insured by such policy by executing a chattel mortgage thereon to the National Bank of Petersburg; and,

4. That in the "proof of loss" furnished by the assured to the insurance company, there was false swearing as to the amount of the goods on hand at the time of the fire.

There was a trial by jury.

The original inventory aforesaid of February 1; 1913, and the books aforesaid were introduced in evidence by the assured without objection on the part of the insurance company.

The inventory is contained in a book. It begins several pages from the first page as the book was originally, but the inventory as there entered is complete, and the non-use and absence of the first part of the book is satisfactorily explained by the testimony in the record.

The testimony for the assured explains how the inventory was taken by a number of employees of the assured, by transferring memoranda of the character of goods, quantity and price or value, first entered on slips of paper, or "tablets," as the work of taking the inventory progressed, from which slips or "tablets" the entries were transferred to and made on the inventory as entered in the inventory book, in the progress of the work, in accordance with the usual manner of taking such an inventory, not only by the assured in preceding years, but by others in the same line of business. The testimony also shows who the employees were who took the inventory, and who the employee was who made the entries on the inventory book. The employee who made the entries on the inventory book, and in whose handwriting it is, was not examined as a witness to prove the book, nor were all of the employees examined as witnesses, who aided in taking the said inventory.

The inventory just mentioned, as taken, gave, as a rule, the cost prices of the goods, but where goods were old or shop-worn a deduction from cost prices was made to cover depreciation, and the inventory value was entered at what was considered the true cost value of the goods if they had been bought in that condition; in no case, however, was any value added for enhancement of value due to increase in market price subsequent to the purchase of the goods.

The books of the assured, as kept, showed the cost price of the January, 1913, purchases and of the purchases subsequent to the annual inventory (the annual inventory last taken next preceding the fire in question being taken as of February 1, 1915, as aforesaid).

For a long while prior to the fire, and prior to the issuance of the policy in suit, certainly as far back as 1911, the assured was engaged in the mercantile business at a number of other places than Petersburg—namely, at Elizabeth City, N. C.; Charlottesville, Va., and elsewhere—which bus-

inesses are referred to in the record as "branches," or branch stores, but they were entirely separate and distinct businesses from that of the assured at Petersburg, as to which separate books were kept and separate inventories taken from time to time. However, during 1912 and 1913, prior to the fire (which periods only are material to be referred to in this connection), shipments of goods from one to another of these branch stores were made from time to time, and the regular course of such business was to treat these shipments as sales and purchases of the respective branches to and from each other; and the branch making such shipments would invoice the goods as sales at original cost prices, or at cost value, to the branch to which they were shipped, and the latter branch would enter such shipments on its books as purchases at such invoice prices.

All of such shipments from the date of the 1913 inventory to the fire, to and from the Petersburg business were entered on the books of the assured kept of that business, and all of the invoices of the character aforesaid covering such shipments during such period were preserved by the assured, furnished to the insurance company, are in evidence, and verify the books in every particular relating to these transactions. The same is true of the entries on the books of the January, 1913, purchases of the Petersburg business and of the original invoices of such purchases.

It should be noted, however, that no inventory of the Elizabeth City business was preserved or furnished the insurance company, and none such is in evidence. The same is true of the invoices of the original purchases of goods by the Elizabeth City concern, so far as appears from the record before us. And the latter is true both as to inventories and invoices of original purchases of goods by the other branch businesses of the assured.

As of September 1, 1913, the assured sold out a portion

of the stock of goods of its business in Elizabeth City to one S. R. Siff Co., Inc., but did not include in such sale certain items of that stock of goods, which items were thereupon invoiced by the Elizabeth City concern for shipment to the Petersburg concern in accordance with the custom of business aforesaid to ship from time to time goods from one branch to another. ·

These goods were all included in one invoice and aggregated the invoice value of $25,912.84.  The purpose was to ship all of these goods in one car and the largest car obtainable was gotten for the purpose.  But it was found that all of the goods could not be gotten in the car and a list of the goods which could not be gotten into the car was made at the time by the Elizabeth City branch and they aggregated $2,299.91 per the invoice values.  The car was shipped to Petersburg and all of its contents were received and added to the stock of that business of the assured before the fire.  The invoice and list of goods not shipped aforesaid were forwarded to the Petersburg store.  The bookkeeper of the latter place of business entered the whole invoice of the goods on the books of the latter concern as received.  The bookkeeper, however, had been informed that there was a delay in the shipment of a part of the goods, but, thinking the delayed goods would soon arrive, did not at the time credit them on the books as per said list.  Somehow the list aforesaid was mislaid, and the bookkeeper consequently overlooked and omitted to enter such credit until after the fire.  The omission of this credit was discovered by the accountant, Wood, on the investigation he made in verifying the books before suit.  A copy of said list was then gotten from Elizabeth City and the credit was entered on the books before suit.

The said invoice and copy of list of the goods mentioned in the next preceding paragraph were preserved; were fur-

nished the insurance company before suit; are in evidence, and verified the books in every particular relating to this transaction.

The said figures of $95,834.20, claimed value of goods on hand at the time of the fire, aforesaid, do not include said $2,299.91 figures. The error in the books of omitting this credit was corrected before suit by the accountant, Wood, as aforesaid.

It should be mentioned perhaps, although not material, that while the accountant corrected this error, he made an error himself in omitting from his figures taken from the books a total of $1,454.93 thereon of items of said goods actually received in the Petersburg place of business from Elizabeth City before the fire, so that the net error against the insurance company would have been only $853.98 if such credit of $2,299.91 had never been made. When the $2,299.91 correction was made by Wood, as just stated, that resulted in making said total of $95,834.20 less than it should have been by said sum of $1,454.93.

There is another circumstance affecting the books which should be mentioned. There were certain shipments of goods from the Petersburg business in October and November, 1913, shortly preceding the fire, which aggregated $4,299 91 invoice value, which were not entered on the books until after the fire. But these entries on the books were made in accordance with the usual course of business from carbon copies of the invoice of such goods made at the time of the shipments in accordance with the usual course of business aforesaid. and such carbon copies were preserved and were furnished to the insurance company and verified the books as to these matters in every particular. The fire did not in any way affect the making of these entries on the books.

There were also certain accounts on the books which were not complete, and certain entries which should have been

26

on certain books which were not there, but other books kept by the assured of the Petersburg business furnished such items, so that said incompleteness of certain books and absence of entries from others did not affect the sufficiency of the books as a whole in the matter of furnishing a complete record of the Petersburg business.

The books showed the discounts actually obtained by the assured.

The accountant, Wood, however, charged the assured with all discounts which could have been obtained on bills for purchases by payment of same before their due dates, although not so paid. Such discounts were not shown by the books and amounted to some $2,000.00.

The books of the assured kept recording the transactions of the business at Petersburg aforesaid, covering the period from January 1, 1913, to the fire and also the years 1911 and 1912, and which were introduced in evidence, consisted of "the journal, the cash book, consisting of cash sales; a book known as 'beat yesterday's record,' charge book (or sales ledgers), installment book, inventory books, invoices, and creditor's ledger." These books showed, for the period from the date of the 1913 inventory and including the January, 1913, purchases, all business transacted by the assured in its Petersburg business, consisting of all purchases and returns of goods; all receipts of goods from the branch stores aforesaid, and shipments of goods to such branch stores; the discounts actually obtained by the assured by cash and anticipatory payment of bills for purchases before due dates of bills; the cost of labor in making the alterations and repairs of goods; the freight paid; the "return sales"—that is, goods sold but returned by the customer. The aforesaid books included not only accounts of the purchases and shipments of goods aforesaid, but also "a capital account and an insurance account. a profit and loss account and interest and discount account, an advertising ac-

count, a rent account, a salary account, a stable account, an expense account, an express account, an ac' ount with each of the department stores, a merchandise account with each department of the business and an account with each of the individual members of the firms" (of the assured), and "accounts receivable from charge customers and from installment sales."

The expert accountant, Wood, aforesaid, a witness for the assured, made out the statement on which the claim aforesaid of the pleadings of the assured was based, arriving at the figures of $95,834.20 as the aggregate total value of the goods insured and burned or injured as aforesaid; and he testified in substance and in detail that, with the exception of the amount added as profits to the inventory and cost prices of goods, and with the exception of the amount of discounts which the assured would have earned but did not by paying bills for purchases before the due date thereof (with which the accountant charged the assured, although not obtained by them) ; and except the deduction of $2,299.91, aforesaid, covering the delayed shipment, aforesaid, from Elizabeth City, he got all of the figures for such statement from the aforesaid inventory of February 1, 1913, and said books. And this witness, by way of summary of his testimony, stated that said books "clearly and plainly present a complete record of the business transactions, including the purchases, sales and shipments, both for cash and credit, from the dates of the respective inventories there and up to the time of the fire in 1913, and as to the stock of goods at Petersburg, Va."

(The reference to "inventories," in the plural, is made because the assured had preserved and also furnished the insurance company and introduced in evidence the inventory taken January 1, 1912, of the stock of goods on hand at said Petersburg place of business at the close of the year 1911. And the books of the assured also covered such bus-

iness for the whole period of the years 1912 and 1913 up to the fire of November 26, 1913, aforesaid.)

It appears in evidence that the said February 1, 1913, inventory and the aforesaid books of the assured and also the invoice aforesaid preserved by the assured, were all turned over to the insurance company about February 26, 1914, and were kept in its possession and examined by its expert accountant in New York for some six or seven months following. This action was not instituted until in November, 1914, and was not tried in the court below until October, 1915.

On · the trial in the court below, the insurance company introduced certain testimony of witnesses and documentary evidence, but did not introduce as a witness its expert accountant who had made the examination aforesaid of said inventory of February, 1912, and of said books and papers. Moreover, the insurance company introduced no evidence, nor is there any in the record, even tending to show that any of the valuations of the goods in the inventory of 1913 or on the books is excessive, or that there was the slightest *mala fides* on the part of the assured in any particular.

Further reference will be found in the opinion of the court below to the evidence and to the absence of evidence in the case.

After all the testimony was in for the assured and the insurance company, the latter demurred to the evidence, and the assured joined in such demurrer.

Thereupon, the court below declined to allow counsel for the insurance company to call the attention of the jury to certain statements of witnesses for the insurance company as to the quantity of the goods shipped from Elizabeth City which were in conflict with the testimony for the assured as to such quantity, and refused to allow counsel for the insurance company to comment on certain alleged deficiencies in the evidence of a witness for the assured which af-

fected the quantity of such goods. That action of the trial court is assigned by the insurance company as cross error.

After the conclusion of argument before them, the jury returned a verdict in favor of the assured for $2,500.00, the amount sued for, as aforesaid, with interest from March 26, 1914, subject to the demurrer to evidence.

Thereupon the insurance company moved the trial court to set aside the verdict as contrary to the law and the evidence and grant it a new trial.

Whereupon the court refused to set aside the verdict and grant a new trial, but sustained the demurrer to evidence and entered the judgment under review, which dismissed the action, with costs against the assured.

The issues made by the assignments of error by both the assured and the insurance company will be further dealt with in the opinion of the court.

*R. H. Mann* and *Henry J. Wyatt,* for the plaintiffs in error.

*Caskie & Caskie* and *R. E. Scott,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

The record in the case is voluminous. The petition and briefs are also exceptionally so. The latter, however, involve a number of questions which we do not find it necessary to deal with. The only questions which need to be considered for the decision of the case, in our view of it, will be disposed of in their order as stated below.

We will first consider the questions raised by the assignments of error touching the inventory in evidence, which is relied on by the assured as sufficient to comply with the

requirements of the iron safe clause of the policy in suit with respect to an inventory.

The defendant insurance company raises the following questions as to the inventory which was taken as of February 1, 1913:

[1, 2]    1. Did its figures of $69,855.79 on total of goods on hand as of the date of such inventory include the January, 1913, purchases of $13,973.67?

We are of opinion that the preponderance of the evidence clearly shows that they did not.

Such evidence shows that while the inventory was taken as on February 1, 1913, the January, 1913, purchases of goods were not included in the inventory, because such purchases were for the spring trade of 1913, and in accordance with the custom and usual course of trade and keeping of accounts of such merchants as the assured, were not considered a part of the business done during the fiscal year ending February 1, 1913, but of the succeeding year. Such purchases were entered on the books of the company as of their date of purchase, it is true, to-wit, in January, 1913, but were extended thereon as purchases for the ensuing fiscal year, and were as such added to said inventory amount of $69,855.79 and were not included in that total.

2. Since the inventory did not include the said January purchases, was it such a "complete itemized inventory of stock on hand" as was required by the "iron safe clause" of the policy of insurance, *quoad* such goods?

Technically and literally speaking, this question would have to be answered in the negative. But the purpose of the "iron safe clause" in insurance contracts is to preserve evidence of the actual existence of the property insured, or from which such actual existence may be verified; and as a matter of fact, the invoices of all of the January purchases

were preserved by the assured in an invoice book and they were subsequently furnished to the insurance company, and showed in detail the items of such goods as fully as an inventory would have done.   Moreover, the books of the assured showed such purchases and the items thereof in as much detail as if they had been entered on the inventory, and these books were preserved and subsequently furnished to the insurance company and are in evidence.   From such books, verified by such invoices, the insurance company could have had no difficulty in arriving at the correct amount of such purchases, and there has been no loss whatever of evidence in the premises by reason of such items of goods not having been formally entered on the inventory book instead of upon another book of the assured.

We think, therefore, that under such circumstances, the books and invoices aforesaid must be taken to be a substantial compliance with the "iron safe clause" requirement of an inventory, so far as such January purchases are concerned.   Substantial compliance with such clause is all that the law requires.   *Hartford Fire Ins. Co.* v. *Farris,* 116 Va. 880, 83 S. E. 377.

3. Was the inventory sufficiently itemized as to the goods in fact covered thereby to comply with said "iron safe clause"?

(a)  As to $3,102.10 of the goods included in the inventory, the position of the insurance company is that they were lumped so that they cannot be fairly regarded as itemized.   But, as appears from the statement preceding this opinion, claim was waived by the assured as to those items; so that it is unnecessary for us to decide the question as to whether they were sufficiently itemized to comply with the "iron safe clause" aforesaid.

[3, 4]  (b) It is claimed for the insurance company that the inventory is invalid because it did not contain the stock

numbers of the items of goods or other data touching the identity of the items in order that such items could be traced to the former inventories, to invoices of them, or the like, so as to ascertain whether defendant was being charged with old or new, out-of-style or shelf-worn goods, or at original cost prices.

There is no provision in the policy of insurance requiring such description in the inventory. The policy requires only a "complete itemized inventory of stock on hand" at the time of the inventory, and any description, which is sufficiently detailed to evidence that it is an actual inventory by items of goods found thereby to actually exist at the time, complies with such contract requirements. The actual existence of the goods at the time of the inventory, as found by an actual inventory, taken in the usual course of business, for the *bona fide* purpose of ascertaining actually existing goods and their values at the time, as contradistinguished from a mere estimate or opinion on the subject, is the essence of such contract provision.

[5]   (c) It is further claimed that the inventory is invalid because it, in many cases, aggregated goods which were of different kinds, such as items giving the numbers of yards "D. G." or "Dr. Goods," *i. e.,* dress goods, at a certain price per yard, when the goods were not all the same kind of material.

In such cases, however, the goods were of the same value per yard, and they were found by the inventory to actually exist in the quantity stated in the inventory. This was all the particularity of statement needed in the inventory, unless it were necessary that the inventory should state the items with sufficient particularity for them to be traced into preceding inventories or into the invoices or other records thereof. As we have seen above, such particularity of description was not requisite. And an inspection of the inventory, as shown in the record, discloses that the items of

dress goods at different prices are very numerous and evidence a detail of itemizing of them which fully satisfies every reasonable requirement in that behalf.

[6]  Objection that they are "lumped" is made also to some entries on the inventory, such as "1 lot jewelry, $10," and the like, not embraced in said $3,102.10 aggregate of items as to which claim is waived by the assured, as aforesaid, but such entries are very few in number and cannot be said to evidence any lack of actual inventory of goods existing at the time, or to be unreasonably lacking in detail, considering the large stock of goods inventoried.

The above are the principal objections to the sufficiency of the inventory of February 1, 1913.  There are some other such objections, but they raise no novel questions, and of these it is deemed sufficient to say that they· have all been considered, and they are, in our opinion, clearly without merit.

It is also urged, however, by the insurance company, in argument before us, that said inventory of February 1, 1913, should not be considered by us as evidencing a compliance with the requirements of the iron safe clause with respect to an inventory, because—

(e)  It is discredited by being in a mutilated book.

(f)  It is not proved by the bookkeeper who made the entries in it or by the employees who made the slips or tablets from which the entries in the inventory book were made; and

(g)  The slips or tablets aforesaid constituted the original inventory, and they alone were admissible in evidence.

[7]  A number of authorities were cited to support these propositions.  These authorities embody well-settled rules of law applicable to the admission of books in evidence.  See *Johnson* v. *Fry*, 88 Va. 699, 12 S. E. 973, 14 S. E. 183, 9 Am. & Eng. Ency. Law, pp. 917, 919, 926; *Lovelock* v. *Gregg*, 14 Colo. 53, 23 Pac. 86; *Deimel* v. *Brown*, 35 Ill. App. 303",

27

*Cheever* v. *Brown*, 30 Ga. 904; *Gilchrist* v. *Brooklyn Mfg. Ass'n*, 59 N. Y. 495; *Gould* v. *Hartley*, 187 Mass. 561, 73 N. E. 656; *Chaffee* v. *United States*, 85 U. S. (18 Wall.) 516, 21 L. Ed. 908; *Swan* v. *Thurman*, 112 Mich. 416, 70 N. W. 1023; *Miller* v. *Shay*, 145 Mass. 162, 13 N. E. 468, 1 Am. St. Rep. 449. But, as appears from the statement of facts preceding this opinion, that part of the book which contained the inventory in question was not mutilated, the inventory itself was complete and unmutilated, and the absence of other pages from the book were satisfactorily explained by the evidence. Further, none of the objections under consideration were made in the trial court to the admission of the inventory as evidence, nor was any motion made to exclude it from the evidence, nor was any such objection made in the grounds assigned of the demurrer to the evidence. Such objections in the trial court, had they been made there, would have put the assured upon notice that strict proof of the entries on the book was insisted upon and would have given an opportunity to the assured to supply the evidence with respect thereto which the rules of law in such case would have required. We see no indication in the record that such evidence could not or would not have been supplied if any issue requiring it had been made in the trial court. We are, therefore, of opinion that such objections being made for the first time in this court, all come too late, and they must be treated as waived. See *Newberry* v. *Watts*, 116 Va. 736, 82 S. E. 703.

[8, 9] 3. Did the iron safe clause as to an inventory require the assured to preserve their inventory taken as of January 1, 1913, at another store of the assured, to-wit, at Elizabeth City, N. C., of the stock of goods there?

The branch house at Elizabeth City was a separate business entirely. Whatever goods were shipped from that concern to the Petersburg concern were, in the current

course of business, treated as sold from the former to the latter concern. They were entered on the books of the assured at Petersburg as purchases in accordance with its regular and usual course of business. These books showed the details of the items of such goods. There were invoices of them by the Elizabeth City concern to the Petersburg concern, showing the same details. These invoices were preserved and delivered to the defendant and verified the books as to such details. These transactions were certainly shipments to, if not, accurately speaking, purchases of, goods by the assured in the Petersburg business.

The iron safe clause concerned only the inventory of the Petersburg business, the goods in that business being the goods which were insured, including "shipments" to it as well as "purchases," as shown by the iron safe clause itself. To construe it to extend to requiring the preservation of an inventory of another business merely because such inventory would furnish additional evidence of verification of the correctness of the books of the assured embracing the business whose goods were insured, or the contrary, would be to go outside of the provisions of such clause, and, hence, to make a contract for the parties which was not in fact made by them.

The subject under consideration is purely a question of contract. We see therefrom that the contract does not require any other inventory to be taken than that of the stock of the assured at Petersburg.

The question under consideration must, therefore, be answered in the negative.

We come now to the question over which what is perhaps the chief controversy in the case exists, and that is this:

4. Did the books of the assured comply with the iron safe clause of the policy in suit?

We will say at the outset of our consideration of this question that the chief and fundamental difference which exists between the assured and the insurance company on the subject under consideration is this: The former take the position that the books required by the iron safe clause of the policy in suit are only books which record the business of the assured transacted at Petersburg from the date of the 1913 inventory to the time of the fire, plus the January, 1913, purchases not included in such inventory, and that it is only as to the transactions of such business, during such time, that the assured can be called upon to verify the completeness and accuracy of such books. Whereas the insurance company contends that the books required by said iron safe clause are books which should also record the original purchases of all goods at the branch stores of the assured, from which goods were from time to time shipped to the Petersburg business and thus mingled with the latter stock, not only from the date of the 1913 inventory to the time of the fire, plus the January, 1913, purchases, but also for the preceding year going back to February 1, 1912, because a complete and accurate record of such business for both periods is essential to a verification of the accuracy of the books for the period from the 1913 inventory to the time of the fire, and became, under a system adopted by insurance companies which was followed by the assured in this case in making out its claim of loss, the percentage of profits added to the cost value of the goods was the ascertained actual percentage of profits of the year's business preceding the 1913 inventory, and, hence, the insurance company contends that the assured is required to verify the completeness and accuracy of its books for the whole time from February 1, 1912, up to the date of the fire, by producing the original invoices of all original purchases of goods during such whole time, not only of the Petersburg business, but of all branch businesses from which goods were ship-

ped from time to time to the Petersburg business and mingled with that stock, and that the invoices of such shipments by the branch houses to the Petersburg house, as was the current mode in which this business was done, as aforesaid, cannot be accepted as invoices in verification of the books as to such shipments; for, as the insurance company claims, to allow this would be to leave the door wide open for fraud on the part of the assured, by invoicing and entering on the books goods as purchases of the Petersburg business which were, in truth, not purchases of that business, but of the assured at another time and at another place of business and merely shipped to the Petersburg business at a later time.

[10] But opportunities for fraud are innumerable, where the disposition to perpetrate it exists. And while the purpose of iron safe clauses in policies of insurance is undoubtedly to shut out certain opportunities for fraud, it is purely a matter of contract as to what opportunities are thereby sought to be shut out. Where the stock of goods of one only of a number of stores of a party is sought to be insured, the insurance company may stipulate in the iron safe clause, or elsewhere in the policy, that such other books shall be kept, besides those covering the particular business in which the stock of goods is sought to be insured, as it may choose to require. Thereupon, the policy may be taken out or not, as the party seeking the insurance may elect. Did the insurance company make such additional requirement in the instant case?

That is to say, in the instant case, we have before us simply a question of construction of the contract of insurance. What books and with what completeness and accuracy does the policy in suit stipulate shall be kept by the assured?

As in the case of the Elizabeth City inventory question above considered and disposed of, so here, the policy sets at

rest the question under consideration as to the books. The business of which the books, required by the iron safe clause of the policy in suit, are to present a complete record is the business of the assured at Petersburg, and such only are the books required to be kept by such clause. And, as appears from such clause itself, as above noted, it was not contemplated by the insurance contract that that business should be confined to original purchases of goods, but it was expected to include as stipulated in such clause, "all shipments" of goods as well. So that we are clearly of opinion that the insurance contract which we have before us does not stipulate that the assured should keep or verify such a set of books as is contended for by the insurance company. Therefore, we are of opinion that the position of the assured aforesaid on this subject is correct and in accord with the insurance contract.

In view, then, of the fact that the insurance contract required only that the set of books which should be kept by the assured should clearly and plainly present a complete record of the business transacted by the assured at its Petersburg place of business aforesaid, including all purchases, sales and shipments, both for cash and credit, from the date of the 1913 inventory to the time of the fire, and including the January, 1913, purchases, we have no difficulty in holding that the evidence in the record is amply sufficient to have sustained a verdict which found, in effect, that such a set of books was kept by the assured and that the loss by the assured was at least the amount claimed, as set forth in the statement preceding this opinion.

The books were not intended or expected to record the profits made nor the discounts which might have been, but were not received; but they did record all the data needed for the ascertainment of such matters.

[11]  As appears from the statement of facts preceding this opinion, the testimony of the expert accountant, Wood,

a witness for the assured, was ample to have sustained a verdict of the jury finding that the books fulfilled every substantial requirement of the iron safe clause. And the fact, adverted to in said statement, that the insurance company had such books in the hands of its expert accountant in New York city for six or seven months and did not even put such expert on the stand as a witness in its behalf, or any other expert accountant to assail the sufficiency of the books to comply with the iron safe clause, is to us convincing evidence in itself of their sufficiency.

The only ground on which the insurance company is left to stand, other than its difference with the assured as to the books which should have been kept and the kind of verification of them required of the assured, aforesaid, which we have considered and disposed of above, is that there were some discrepancies between the amounts of the goods on hand at the time of the fire as first claimed by the assured, which was $113,214.57, as that total was taken from the books by M. E. Lavenstein, a member of the firm of the assured, and the amount of $103,866.56 as taken from the books as such value by an expert accountant named Weiss, first employed by the assured to aid in making out the proof of loss, and the amount of $95,834.20, aforesaid, as taken from the books by Wood, as aforesaid, which wide variances evidenced that the books did not measure up to the requirements of the iron-safe clause aforesaid, as is claimed by the insurance company.

In so far as the period from the date of the 1913 inventory to the fire is concerned (as to which alone, except as to the January, 1915, purchases, the assured was under contract obligation to keep books, as aforesaid) the only material discrepancies between the Lavenstein, Weiss and Wood statements, aforesaid, which could have affected the completeness and accuracy of the books of the assured of its Petersburg business, were the following matters:

(a) The omission of the credit on the books in September, 1913, of the $2,299.91 of Elizabeth City goods, which failed to arrive in Petersburg before the fire—as to which the facts are set forth in the statement preceding this opinion.

(b) The $4,299.91 credits of shipments from Petersburg to branch stores just preceding the fire, in November, 1913, being made on the books after the fire, in the usual course of business of posting the books—as to which also the facts are set forth in the statement preceding this opinion.

Lavenstein and Weiss made their statements before these omissions in the books were discovered. They were omissions which might occur in any, even exceptionally well-kept, books. The evidence clearly establishes that they were not omissions designedly made, and that they were, moreover, not unreasonable in their character, considering the volume of the business and the circumstances under which these credits on the books were not sooner made.

Further: These credits were in fact all entered on the books before suit, and after allowing them the books showed the total of sound value of $95,834.20, aforesaid (and indeed $1,454.93 additional, as set forth in the above statement of facts), of goods on hand at the time of the fire, as claimed by the assured in the suit.

We are of opinion that the iron safe clause in question does not require that the books of the assured should be free of such character of errors.

Of the other discrepancies between the statements of Lavenstein, Weiss and Wood, we deem it sufficient to say that there is ample testimony for the assured in the record to satisfactorily explain them, down to a difference of a little over a hundred dollars, without in any way affecting the completeness and accuracy of the books so far as required to be kept by the iron safe clause, as aforesaid. This result in itself is also, to us, convincing evidence of the suf-

ficiency of such books to meet every reasonable requirement of the iron safe clause.

A great many authorities are cited for the assured on the subject of what character of books, as to completeness and accuracy, the authorities hold to be requisite to comply with the iron-safe clause aforesaid, and many authorities are cited on the same subject for the insurance company. Among the latter are the Virginia cases of *Scottish Union Ins. Co.* v. *Va. Shirt Co.,* 113 Va. 353, 74 S. E. 228; *Phoenix Ins. Co.* v. *Sherman,* 110 Va. 435, 66 S. E. 81; *North British Ins. Co.* v. *Edmundson,* 104 Va. 486, 52 S. E. 350; *Homestead Fire Ins. Co.* v. *Ison,* 110 Va. 18, 65 S. E. 463; and *Hartford Fire Ins. Co.* v. *Farris,* 116 Va. 880, 83 S. E. 377. But there is no real difference on this subject between the positions in argument of counsel on both sides of the case. They, in effect, concur in the view that the authorities hold that a literal compliance with the requirements of the iron safe clause is not essential and that a reasonable and substantial compliance is all that is required. This is a correct summary of the holding of the authorities on the subject, and we are, therefore, relieved of any need of discussing them.

Applying such holding to the facts of the case before us, we are of opinion that the books in question fulfill the requirements of the iron safe clause of the policy in suit.

There still remains, however, a question for our determination which in part concerns the books aforesaid, although they are sufficient to comply with the iron safe contract clause. Such question remains, notwithstanding that conclusion, because the assured undertook to prove the percentage of profits made in its business in 1912, for the purpose mentioned above, by relying on such books, as verified by documentary evidence and as aided by parol testimony, as proof of such business and profits during that period. That question is this:

[12]   5. Were the said books sufficiently verified for the period of 1912 to establish what percentage of profits were made by the assured in its Petersburg business during that time?

Aside from the position of the insurance company, aforesaid, on the chief question of fundamental differences, above considered and passed upon, the claim of the insurance company is that the books were insufficiently verified as to certain shipments or alleged shipments of goods to the Petersburg business from other branch stores of the assured in 1912, and as to a certain shipment from a Norfolk branch store of the assured to the Elizabeth City branch store also in 1912.

It is deemed sufficient to say of these matters that since there was no contract requirement that the assured should keep books covering these transactions for 1912 (a period which antedated the inventory of 1913), so far as the transactions in question entered into the Petersburg business of 1912 and affected the ascertainment of the percentage of profits of that business in that year, they were matters as to which the facts were open to be established by any competent evidence. The weight and effect of such evidence would have been for the jury but for the demurrer thereto, and there was ample evidence before the jury to have warranted them in holding that the percentage of profits included in said claim of the assured was conservative and fair in amount as ascertained from the actual business transacted by the assured at Petersburg in 1912, as shown by the books and the other evidences for the assured in the record.

[13]   We come now to the consideration of the following question:

6. Did the assured encumber the stock of goods insured with a chattel mortgage?

This question must be answered in the negative.

The writing relied on by the insurance company to constitute such mortgage is a note of the assured payable to its own order and endorsed to and held by the National Bank of Petersburg, dated October 14, 1913, for the sum of $10,-000.00. The note is in the usual form of a negotiable, collateral security note, and, so far as material, provides, after the obligation to pay, as follows:

"* * * having deposited as collateral security for the payment of this and any other liability of........to the holder hereof now due or to become due, or that may hereafter be contracted, the following property, with authority to use, transfer or hypothecate said collaterals; * * *.

"Lien on all stock, fixtures and accounts, etc., in our stores, 31-33 Sycamore street, city. (8367) the market value of which is now $......, with the further right to call for additional security in case there should be a decline in the market value thereof; * * *."

The designation 31-33 Sycamore street, city, correctly describes the place of business of the assured in Petersburg, aforesaid. But—

The said note and the provisions thereof are plainly insufficient to create a chattel mortgage. 4 Elliott on Contracts, sec. 3031; 5 *Idem*, sec. 4750. Nor does it create a lien. And the undisputed fact, as shown by the record, is, that the assured never created or attempted to create, any lien on said stock of goods covered by the insurance policy in suit.

And, no lien having been created, or intended to be created, the doctrine of equitable lien or mortgage cannot apply, as was correctly held by the learned judge of the trial court. So that there was neither a legal nor an equitable encumbrance created by the assured on the subject of the insurance after the policy in suit was issued; far less an encumbrance by chattel mortgage.

7. Did the collateral security note aforesaid prevent the ownership of the assured of the subject of the insurance from being "other than unconditional and sole ownership"?

This question must be answered in the negative for the reasons indicated in the consideration of the question next above.

And even if the writing in question had created a mortgage, that would not have deprived the assured of the "unconditional and sole ownership of the property conveyed." See *Manhattan Ins. Co.* v. *Weill,* 28 Gratt. (69 Va.) 389, 26 Am. Rep. 364; *Morotock Ins. Co.* v. *Rodefer,* 92 Va. 747, 24 S. E. 393, 53 Am. St. Rep. 846; *Union Assur. Society* v. *Nalls,* 101 Va. 613, 616, 44 S. E. 896, 99 Am. St. Rep. 923; 2 Cooley on Ins. 1378, 1379, 1383.

The next question we have to pass on is this:

[14] 8. Was there false swearing in the proof of loss as to the amount of goods on hand at the time of the fire?

The question must be answered in the negative.

The rule of law on this subject is well settled and is to the effect that such false swearing to forfeit an insurance policy must consist in an oath to statements knowingly and willfully false or recklessly made. *Va. Fire & Marine Ins.* v. *Hogue,* 105 Va. 369, 54 S. E. 8; *North British Ins. Co.* v. *Nidiffer,* 112 Va. 591-596, 72 S. E. 130, Ann. Cas. 1916 A, 464.

The proof of loss was based on statements made out by Weiss, the expert accountant first employed by the assured. There were mistakes therein, but, as shown by the evidence, as above indicated, they were honest mistakes, not misstatements of fact designedly made. They were honestly believed by the assured to be correct at the time the proof of loss was sent to the insurance company.

The sole question remaining for our consideration is raised by the cross assignment of error of the insurance company mentioned in the statement preceding this opinion, and that, in substance, is this:

9. The cross assignment of error mentioned in the statement preceding this opinion raises the question whether it was error in the trial court to refuse to allow counsel for the insurance company to call the attention of the jury to certain statements of witnesses for the insurance company as to the quantity of goods shipped from Elizabeth City which counsel claimed were in conflict with the testimony for the assured as to such quantity, and to refuse to allow such counsel to comment on certain alleged deficiencies in the evidence of a witness for the assured which counsel claimed affected the quantity of such goods, on the ground that such counsel was restricted in any argument he might make, as to the amount of judgment to which the plaintiffs might be entitled, to the evidence for the plaintiffs and such evidence of the defendant company as was not in conflict with the evidence for the plaintiffs.

This assignment of error affects only the question of fact as to whether the quantity of goods in the store at the time of the fire and destroyed or damaged thereby was such that they aggregated as much as $80,000 in value, the full amount of all the insurance thereon, so as to entitle the plaintiff to recover the full amount of $2,500 covered by the insurance policy in suit.

We have carefully examined all the evidence in the case on this subject and we deem it sufficient to say in this connection that it was such that the jury could have properly reached no other conclusion than that the preponderance of all the evidence in the case clearly established that there was such a quantity of goods in store at the time of the fire which were destroyed or damaged thereby that they aggregated the value of at least $80,000; and hence if the action of the trial court under consideration was in error, it was harmless error.

We so hold without at this time passing on the interesting question of whether under our present practice the de-

murrer to evidence rule applies to the consideration by the jury of the evidence on the issue of the *quantum* of recovery to which a demurrant may be entitled, subject to the opinion of the court on the demurrer, which issue is still to be decided by the trial jury, notwithstanding the demurrer to evidence.

But for the reasons aforesaid we are of opinion to reverse the judgment under review, and we will enter such judgment as, in our opinion, the trial court should have entered; namely, we will overrule the demurrer to the evidence and enter judgment for the assured, the plaintiff in the trial court, in accordance with the verdict of the jury aforesaid, with interest and costs.

*Reversed.*

BURKS, J., dissenting:

I prepared an elaborate dissenting opinion in this case, but have determined not to deliver it, as the dissent is on questions of fact, and hence the opinion could be of little, if any, value in the determination of future causes. I regret that I have been unable to deduce the same facts from the evidence as my brethren. I have deemed it necessary to say this much in explanation of my dissent, as we do not, in the main, differ on the questions of law involved.