## Richmond.

SCOTTISH   UNION   AND   NATIONAL   INSURANCE   COMPANY   v.
VIRGINIA   SHIRT   CO.

March 14, 1912.

1. FIRE INSURANCE—*"Iron Safe Clause" of Policy—Substantial Compliance—Fraud.*—The "iron safe clause" in fire insurance policies, by which the assured is required to make itemized inventories and to keep a set of books "clearly and plainly presenting a complete record of business transacted," is a reasonable stipulation in the contract, and if a loss by fire occurs, and the insured is unable to show, at least, a substantial compliance therewith, he has no just cause to complain of his inability to recover on his policy. It is not sufficient for the insured to show that no fraud was intended by his failure to keep and produce such inventories and books, but he must show a substantial compliance with the terms of his contract in order to entitle him to recover.

2. FIRE INSURANCE—*"Iron Safe Clause"—Inventories—Books—Gross Entries.*—Inventories and books of a shirt manufacturing company which fail to disclose the quality, quantity, or value of goods purchased, manufactured, or sold, but contain gross items, such as "piece goods," containing thousands of yards, without disclosing where they came from, nor when received, nor the character of the goods, is not such a compliance with the "iron safe clause" as will entitle the assured to recover on a policy of insurance on the stock of goods of the company.

Error to a judgment of the Corporation Court of the city of Fredericksburg, in an action of assumpsit. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Phlegar & Powell* and *A. T. Embrey*, for the plaintiff in error.

45

*Carter & Carter* and *St. George R. Fitzhugh*, for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The defendant in error (who will be spoken of hereafter in this opinion as the plaintiff) brought this action against plaintiff in error (spoken of hereafter as the defendant) to recover the amount of an insurance policy upon the plaintiff's stock of goods and materials, consisting chiefly of cotton fabric goods known as denim, in entire bales, part bales, cut into parts or made into garments, also thread, buttons, and trimmings, and such other goods and materials, not more hazardous, usual to the shirt and overall manufacturing business, while contained in their one-story store, tin roof, brick building, situated  *  *  *  in Fredericksburg, Va.  *  *  *  "

This policy of insurance was for $2,500, and there was $32,500 of other and concurrent insurance on said property. The factory and insured personal property were destroyed by fire about 5 o'clock A. M., December 9, 1909, the origin of the fire being mysterious, it having originated in a room remote from any fire, and when no one was in the building. The plaintiff made claim that its loss by the fire was as follows:

| | | |
|---|---:|---:|
| Piece goods of the value of | $52,605 | 45 |
| 616 dozen overalls and coats, selling value | 3,853 | 46 |
| Total | $56,458 | 91 |
| Subsequently deducted for goods returned | 350 | 00 |
| Net amount of loss as claimed | $56,108 | 91 |

Upon the trial of this cause, and after the evidence had gone to the jury, the defendant company demurred thereto, in which demurrer the plaintiff joined, and the court overruled the demurrer to the evidence, and entered judgment for the demurree for the amount ($1,740.99) ascertained as the damages by the verdict of the jury, subject to the ruling of the court upon the demurrer, to which judgment this writ of error was awarded.

There are quite a number of assignments of error in the petition for the writ of error, but, in the view we take of the case, it is only necessary to consider the one relating to the ruling of the trial court on the demurrer to the evidence.

The defenses relied on were, first, those arising under the iron safe clause of the policy; and, second, because there was false swearing as to the amount of goods or stock on hand December 26, 1908, when the last inventory was taken, and at the time of the fire, and as to what the inventory of December 26, 1908, included, and how it was taken.

Omitting, as unnecessary, a discussion of the evidence relied on as supporting the defense of false swearing as to amount of goods or stock on hand when the inventory of December 26, 1908, was taken, etc., we are brought to the question whether or not the judgment of the trial court upon the demurrer to the evidence on the first-named ground of defense was erroneous?

The policy sued on is the second annual renewal of the original policy, which was taken out in 1907, and the iron safe clause it contains is the standard iron safe clause, and the same in all respects as that construed by this court in *Phoenix Ins. Co.* v. *Sherman*, 110 Va. 435, 66 S. E. 81. Among other things, it required the insured (1) to take a complete itemized inventory of stock on hand at least once in each year; (2) to keep a set of books, which shall clearly and plainly present a complete record of the business transacted, including all purchases, sales, and shipments, both for cash and credit, from date of inventory; (3) to keep such books secure from fire which would destroy the insured property; and (4) to produce them in case of a loss by fire. By its terms, the failure to perform said conditions made the policy null and void, and no action could be maintained thereon. It appears, therefore, that the plaintiff was under contract obligations to the defendant, from the date of the first policy in 1907, to take, preserve, and produce complete itemized inventories, and such a set of books as would clearly and plainly present a complete record of the business transacted.

It further appears that the first inventory, taken on January 1, 1907, did not show the quantity or kind of piece goods on hand, or itemize the different kinds of garments on hand; that a new

356   Scottish Union Ins. Co. *v.* Virginia Shirt Co., 113 Va. 353.

Opinion.

set of books was opened with this inventory as the starting point, and that the first inventory was the foundation of all subsequent inventories, accounts, and statements of assets. The second inventory, taken December 31, 1907, by which the books were balanced for the year, also did not itemize the garments, distinguish the kinds, or quality, nor did it so designate the cloth, trimmings, etc., on hand that they could be identified or traced. A third inventory was taken on December 26, 1908, (about one year before the fire,) and shows garments, goods, and supplies on hand $50,763.73, upon which the plaintiff relies as a compliance with the first paragraph of the iron safe clause, and which Brown, general manager and superintendent of the plaintiff, who testified as a witness in its behalf, says showed the goods and the value thereof on hand when the inventory was taken. The first item in this inventory is "175 dozen overalls and coats, $6.50, $1,137.-50," and is followed by fourteen other items, differing only in numbers and value of the goods per dozen included in the several items. Next follows an item, "11 Job, $3.25, $35.75," and later ten items of "piece goods," aggregating 337,965 yards, which make up a total valuation of $26,795.51. With respect to the item "175 dozen overalls and coats," and all items of overalls and coats on the inventory, Brown stated that the valuations named were the selling prices; that there was some difference between the costs of coats and overalls; that the coats required less goods than the overalls, and he could not tell how many garments in each item of the inventory were overalls or how many were coats. These garments, it appears, were not sold in suits of coat and overalls, so that to list "coats and overalls," without designating the number of each, was far from being in itself satisfactory as an "itemized inventory."

With respect to the ten items of "piece goods" contained in the inventory, and aggregating 337,965 yards, Brown testified that he could not tell where any of these goods came from, nor when received at the factory, nor which were denims and which drills; that there were both denims and drills, which statement was only qualified by the witness saying he hardly thought there were any drills—if any, a very few.

At an interview between Brown and a representative of the

insurance company, February 1, 1910, with respect to the inventory of December, 1909, a part of which was read to him, Brown admitted that he could not tell how many garments of certain-named kinds were included, because all were set down at one price; that he did not think any one else could look at and interpret that inventory; that he could not tell what kind of overalls the first line referred to; that he "could not tell from that statement to save his life"; and, as a witness in this case, when on cross-examination his attention was called to his admissions on the occasion just referred to, he said, "I say it yet"; which was in effect to confirm his admission that neither he, who had taken the inventory and made the entries therein, nor any one else, could interpret it.

To follow further in detail the evidence given by Brown, relied on to explain the inventory of December, 1908, would serve but to disclose the unsatisfactory character of the interpretation he attempted to give to the inventory, and that thousands of dollars' worth of goods claimed to have been in the factory at and shortly prior to the time of the fire were not included in the inventory, while others were lumped in without discrimination between the character or value of the goods embraced in the several items, such as "overalls and coats," different garments not sold as suits, costing different prices, requiring different qualities of goods, some most probably made of a certain kind or quality of goods and some of another; "piece goods," aggregating hundreds of thousands of yards, in a factory using denims, drills, and khaki, cottons and shorting, without a line to indicate the kinds of "piece goods" embraced in the several items, "11 Job, $3.25, $35.75," and "6,681 yards cottons, 4½, $500.64."

Whether or not the plaintiff has shown a compliance with its obligation to keep and produce such a set of books as would "clearly and plainly present a complete record of the business it transacted," the facts appearing are that there were kept, until the fire, (1) a receiving book, on which were entered the numbers of bales and cases, and the bale, case, and invoice numbers and kind of every article of merchandise, from which the consignors could be ascertained, and from which the invoices were checked and marked "O. K.," which book was not kept in the iron safe

and was burned with the goods; (2) what the witness Brown called a "pass book," but which, with the cutting tickets that were filed in "book form," was in fact the "manufacturing book," and, if preserved, would have shown the real amount of goods in the factory. With respect to this "pass book" and the "cutting tickets" Brown testifies that they were a record of the number of yards of goods that were cut up; that keeping them was the only way he could arrive at the quantity of merchandise he was using monthly; that they showed the number of yards used at each cutting, and it appeared from one of these tickets, which was preserved by Brown and produced, that they also showed the number of garments cut, their sizes, and the quantity of cloth required for each style of goods. All of those tickets, except two, as well as the "pass book," were burned with the goods. In the "pass book," according to Brown's testimony, there was entered the number of yards, kind, and prices of all the goods received in the factory, and the amount of each kind used; that the amounts used were carried into that book monthly from the "cutting tickets"; that this was done so that he (Brown) could see how much goods he had on hand of each kind; and it clearly appears that no other book contained the information to which Brown adverted. It also appears from Brown's testimony that this "pass book," which he admits was not kept in the safe, would have furnished valuable information as to the quantity, character, etc., of the goods in the factory at the time of the fire, which information the defendant was entitled to have forthcoming under its contract with the assured.

It further appears from the evidence that not only were the books kept by the plaintiff of a loose and unbusiness-like character, but they and all other data which would have served to give an intelligent understanding of the amount, quality, value, etc., of the insured goods on hand at the time of the fire, were not kept in the iron safe, but laid around loosely, and in such a way that those in charge of these books and other data were bound to know that their destruction in case of fire was inevitable. In the circumstances existing after the fire, the chief, if not the only, source of information as to what goods were on hand and lost by the fire is through the witness Brown, who has to testify from memory

only as to what goods were on hand, their character, value, etc. True there were other books kept—a journal, ledger, and sales book, but they do not serve to relieve the situation, for, according to Brown's evidence, the "pass book," which he says was his private book, for his private information, which was destroyed, was essential to an intelligent understanding of the books that were kept by the regular book-keeper. That "pass book" furnished a check on the monthly statements of the value of goods used, which Brown furnished to the book-keeper to be entered on the books, and without it the yardage, character, quality, and value of the goods destroyed could not be ascertained with any degree of certainty.

A. D. Tapscott, a witness for the plaintiff, and who was its book-keeper, testified to the effect that the books he kept and statements made by him were from memoranda or statements furnished him by Brown, the general manager; that he had nothing to do with orders for the goods; that he knew nothing of goods coming in, and had nothing to do with them until the bills were turned over to him by Mr. Brown, when he entered them on the books the same day. Brown says that usually he did not turn the bills over until he had cut the goods into garments. Tapscott further says there was nothing by which to verify Brown's statements; that there was no cash account, no account of any purchases until the bills were delivered to him as stated. Brown testified that he had purchased in one bill $40,000 worth of goods, in the spring of 1909, which were being delivered up to the time of the fire; but no information was furnished as to whether or not those goods, or any of them, or which of them, were in the building at the time of the fire.

J. A. McKenna, an expert book-keeper and accountant, was employed by the defendant after the fire to examine and report on the books of the plaintiff which were not destroyed by the fire, and, testifying in this case for the defendant, says, in effect, that there was nothing on the books in the way of accounts or memoranda which would enable him to verify the quantity of goods as to yardage or pieces, which were taken in the inventory, and that there were no data on the inventory which would enable him to verify whether the goods were on that instrument, because, the

piece goods, as they were called, were without designation as to the kind, or description as to manufacturers, or who was the manufacturer of the goods. He further said that neither the inventories nor the books showed the number of overalls and coats that were manufactured during the year 1908, nor the number of yards used in the manufacture of overalls and coats. He further testified that he could not from the books make a calculation of the amount of spool cotton or cotton goods on hand, because there was no record which showed the amount of consumption, and, therefore, he had to estimate it, and that he could not tell the cost of overalls claimed to be on hand at the time of the fire.

Without going further in detail into what was testified by this witness, it is sufficient to say that, upon a careful examination of the books, inventories, and invoices, for the purpose of getting information as to what was in the factory at the time of the fire, it was impossible for him to ascertain from them the information desired, nor could he verify the quantity of goods manufactured in 1907, 1908, or 1909; and with respect to Brown's statements as to the value of the piece goods and material manufactured, he says that they were not drawn from the books, but were nevertheless made the basis of book entries by Tapscott, the book-keeper, and that there were not book entries corresponding with the items on Brown's statements of "made and shipped" goods or garments. It is very true that the plaintiff showed by duplicate invoices the amount of goods purchased from January 1, 1907, to the date of the fire, and showed from its books how many dozen overalls and coats together, not separately, had been sold, but it did not show the number of yards and costs of goods used, or even the number of yards and value of goods in the house. The books which would have given this and other valuable information were destroyed, while those preserved gave no information in this respect. It is true that whatever defects were found in the books preserved and examined by McKenna were not due to the book-keeper's fault, but to statements furnished by Brown, or the lack of such statements. The effect of all this is that no means were provided by the plaintiff by which it could be intelligently ascertained what business the plaintiff had transacted, or, with any degree of accuracy, what goods it had on hand at the time of the fire.

The authorities uniformly sustain the validity of the iron safe clause in an insurance policy, on the ground that its provisions, requiring itemized inventories and a set of books, "clearly and plainly presenting a complete record of business transacted," provide a check upon fraud, and by a compliance therewith a means of ascertaining with reasonable certainty the amount of goods ·on hand would be forthcoming. This. iron safe clause is a reasonable stipulation in the contract, fair alike to the insured as well as to the insurer, and if a loss by fire occurs, and the insured is unable to show, at least, a substantial compliance with the requirements of his contract, he has no just cause to complain of his inability to reap its intended benefits.

In this case the defendant's proportion of the loss sustained by the plaintiff was one-fourteenth, the policy containing the usual three-fourths value clause and a permit to have additional ·concurrent insurance, and the verdict of the jury indicates very .strongly that they were of opinion that the whole amount the plaintiff was entitled to recover of all the companies whose policies it held was $24,373.86, and that the value of the goods destroyed was but $32,498.48, instead of $56,108.61, as claimed by the plaintiff.

To vitiate the policy by a non-compliance with the terms of the iron safe clause, it is not essential, as it seems to be contended for the plaintiff, that the non-compliance was with the intent to perpetrate a fraud, for to say that the iron safe clause shall operate only where there is other proof of fraud would be to deny the force of the clause, as the fraud would of itself vitiate the contract. The true rule deducible from the authorities is that which this court has adopted, and which requires, not a strict or literal, but a reasonable, compliance with the terms of the contract.

The iron safe clause required the preservation of the books which were kept; the object of this requirement being, as we have ·observed, to provide a means for ascertaining with reasonable certainty what goods were destroyed, and in this case two books, which, with a proper account of purchases, would have given this information, were left exposed to the fire and destroyed .along with the insured property. The plaintiff was conducting .a large shirt and overall manufacturing business, and without

such a compliance with the requirements of the policy as furnished a complete record of the business transacted, distinguishing between the kinds of goods used, the kinds of garments manufactured, the quality of goods used in making them, the sales and shipments of the manufactured garments, as well as the purchases of material actually made, the goods converted into the garments sold and shipped, there is no room for a difference of opinion among reasonably fair-minded men that there has not been a substantial compliance on the part of the plaintiff with the obligations imposed upon it by its policy. The evidence very plainly discloses that the inventory relied on was not such an itemized and complete inventory of the insured goods as it was, by the terms of the policy, required to take, keep, and produce, and that such books as were not destroyed by the fire (which were also relied on by the plaintiff) fall far short of the requirement in the policy to keep and produce such a set of books as would "clearly and plainly present a complete record of the business transacted."

The inventory is no more satisfactory as "a complete itemized inventory of the stock of goods" than that relied on by the insured in *Phœnix Insurance Co.* v. *Sherman, supra,* which was held to be insufficient; nor are the books kept and produced more satisfactory than those relied on in that case.

Among the authorities cited by the learned counsel for the plaintiff are the cases of *Prudential Fire Ins. Co.* v. *Alley,* 104 Va. 366, 51 S. E. 812, and *N. B. Ins. Co.* v. *Edmundson,* 104 Va. 487, 52 S. E. 350. With respect to those cases it need only be said, as was said in *Prudential Fire Ins. Co.* v. *Sherman, supra,* that they do not apply to the facts of the case under consideration. In this case, as in the last named case, the insured has not, as required by the terms of its policy, provided the means by which the insurer could know, with reasonable certainty, the character and value of the insured goods destroyed by the fire.

The case of *Conn. Fire Ins. Co.* v. *Jeary,* 60 Neb. 338, 83 N. W. 78, 51 L. R. A. 698, is also cited for the plaintiff. In that case a recovery upon the policy was sustained upon the ground (not in accordance with the weight of authority) that to work a forfeiture all the conditions of the policy must be broken, and not a particular one of them.

In *Arnold* v. *Indemnity Ins. Co.*, 152 N. C. 232, 67 S. E. 574, the policy sued on covered articles in which the insured was dealing as a proprietor of a livery stable business, and the court merely holds that a description and itemized valuation of the principal articles in which the insured was dealing, such as "3 rubber tire buggies, $98.00, $294.00; 6 top buggies, $46.85, $281.10; 3 open buggies, $36.00, $288.00," etc., was a substantial compliance with the iron safe clause, and that the fact that one item was listed, "harness, robes, collars, and horse blankets, $1,250.00," which in itself was not a compliance with the clause, would not affect the validity of the whole inventory so as to authorize a forfeiture, especially where there was no question of the *bona fide* character of the loss.

In *McNutt* v. *Va. Fire Ins. Co.*, (Tenn.) 45 S. W. 61, the insured supplied all deficiencies in the books he honestly endeavored to keep, and this was held, and rightly, to be a substantial compliance with the iron safe clause of the policy.

To the same effect only is *Ætna Ins. Co.* v. *Fitze*, 34 Tex. Cir. App. 214, 78 S. W. 370, also cited for the plaintiff in this case.

Nor do the cases of *Mer. Nat'l Ins. Co.* v. *Dunbar*, 38 Ill. App. 582, and *Nalin* v. *Mer. Tenn. Mu. Ins. Co.*, 105 Mo. App. 625, 80 S. W. 56, sustain the plaintiff's contentions in this case. In the first-named of those cases the insured forgot to put a small book in the safe, containing part of an invoice, but as the stock of goods insured and destroyed by the fire had been seen only eighteen days before the fire by an agent of the insurer, it was held that the neglect to put the "small book" in the safe, so that it could be produced, did not forfeit the insured's right to recover on the policy.

The syllabus of the second-named case is as follows: "A failure to comply literally with a requirement in a fire insurance policy, that insured shall keep a set of books, presenting a complete record of business transactions, does not work a forfeiture of the policy, but its purpose is accomplished when insured produces data from which the amount and value of the goods in stock at the time of the fire can be reasonably estimated." That is not the case we have upon the record before us.

The case of *Phœnix Ins. Co.* v. *Angel*, (Ky.) 38 S. W. 1067, also

cited for the plaintiff here, made a ruling, sustained neither upon reason nor authority, that, as there was no consideration for the agreement to preserve evidence of the extent and value of the goods lost by the fire, the agreement was void.

We are of opinion that, upon the demurrer to the evidence in this case, the judgment should have been for the demurrant, the defendant ; therefore the judgment of the trial court is reversed, and this court will enter the judgment that it should have entered.

*Reversed.*