BRAND DISTRIBUTORS, INC.,
Plaintiff-Appellant,

v.

INSURANCE COMPANY OF NORTH AMERICA, Defendant-Appellee.

No. 74–2344.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1975.

Decided Jan. 21, 1976.

Robert C. Nusbaum, Norfolk, Va. (James M. Gallagher, Howard E. Gordon, Hofheimer, Nusbaum & McPhaul, Norfolk, Va., on brief), for plaintiff-appellant.

Edward A. Marks, Jr., Richmond, Va. (Arch Wallace, III, Sands, Anderson and Marks, Richmond, Va., on brief), for defendant-appellee.

Before WINTER, BUTZNER and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

This diversity case is upon Jeweler's Block Policy No. JB 29381, issued by defendant-insurance company to plaintiff-assured, and is on account of a loss by robbery. The sole question is the construction of the policy.

Suit was originally brought in the Circuit Court of the City of Norfolk and was moved to the district court because of diversity of citizenship of the defendant. Trial was before the court and a jury; however,

when defendant moved for a directed verdict at the close of all the evidence, the jury was withdrawn by stipulation and the controlling question of law was submitted to the court. Judgment was entered for plaintiff in the amount of $67,861.82. Plaintiff has appealed, contending that judgment should have been in the amount of $84,918.60. We reverse and direct entry of judgment in the larger amount.

There are no disputed questions of fact, and the outcome of the appeal depends upon the construction to be placed upon three clauses of the policy. It is stipulated that on July 23, 1973 two unidentified robbers entered plaintiff's store in Norfolk, Virginia, and, at gun point, took and carried away four categories of merchandise: 19 diamond watches, 6 gold bracelets, 6 items of customers' property in plaintiff's possession, and 306 other items of diamond jewelry. There is no dispute but that the loss is covered by the policy issued by defendant. It is also stipulated that all conditions in the policy, such as the filing of proofs of loss, have been complied with. Liability on the policy is now conceded by the insurance company. The only issue is as to the amount of liability.

The parties have stipulated that plaintiff is entitled to recover the following amounts for the first three of the above enumerated categories of loss:

| | |
|---|---|
| Diamond watches | $4,864.85 |
| Gold bracelets | 598.76 |
| Customers' property | 933.15 |
| Total | $6,396.76 |

The only dispute is on the amount allowable for the miscellaneous diamond items. Defendant contends, and the district court held, that the correct amount is $61,465.06, for a total of $67,861.82. Plaintiff contends that said amount should be $78,521.84, for a total of $84,918.60. Thus, $17,056.78 is in dispute.

The disputed amount of $17,056.78 is the difference between the original cost to plaintiff of the stolen items and what it would have cost plaintiff to replace said items at the time of the loss. Defendant contends that original cost is the proper basis for its liability. Plaintiff's position is that the policy protects it to the extent of the replacement cost. No issue was raised as to the amount of the original cost. Plaintiff offered evidence which tended to establish the amount of the replacement cost by the testimony of its president, Milton Kaplan, supplemented by the expert testimony of two diamond merchants, John Linley and Eli Nhaissi. When the final stipulation was made, at the time the jury was withdrawn at the end of the trial, defendant agreed to stipulate to plaintiff's figures as to replacement cost, and it was expressly agreed that if plaintiff's interpretation of the policy is correct, plaintiff is entitled to recover the amount specified by Kaplan as the replacement cost, but that if defendant's interpretation is correct, the recovery is limited to the established original cost.

The proper interpretation of the policy requires the consideration of three paragraphs: 8(A), 9(A) and 13. First to be considered is 9(A), dealing with valuation, as follows:

"9. Valuation

(A) The Company shall not be liable beyond the actual cash value of the property at the time of any loss or damage and the loss or damage shall be estimated according to such actual cash value with proper deduction for depreciation, however caused, and shall in no event exceed the lowest figure *put upon* such property in the assured's inventories, stock books, stock papers or lists existing at the time the loss occurred, nor the cost to repair or replace the same with material of like kind and quality. . . ." (Emphasis added).

Defendant contends, and the district court held, that only in the Unit Control Cards, kept by assured in compliance with Paragraph 8(A), did the plaintiff "put upon" the stolen merchandise an evaluation. Acquisition cost and sales price are the two figures

mentioned in the control cards, acquisition cost being the lower of the two figures. Thus, the argument runs, the defendant's protection of the stolen merchandise does not exceed that amount.

Paragraph 8(A), generally referred to as the iron safe clause, provides as follows:

"8. Records. It is a condition of this insurance that:

(a) The assured will maintain a detailed and itemized inventory of his or their property and separate listing of all travelers' stocks, in such manner that the exact amount of loss can be accurately determined therefrom by the Company."

Such a clause has long been customary in all policies issued on a shifting stock of merchandise. *Phoenix Ins. Co. v. Sherman,* 110 Va. 435, 438, 66 S.E. 81 (1909).

In compliance with Paragraph 8(A), assured maintained what was known as Unit Control cards. There was a separate card on each of the 306 items of stolen merchandise in issue. One of these cards, the one used as an example in the explanatory testimony, is reproduced as follows:

It is stipulated that these Unit Control cards are an adequate compliance with the requirements of Paragraph 8(A). Said cards, with specific reference to the one above reproduced, were explained by witness Seymour B. Levinson, Vice-President, Secretary, Controller, and chief financial officer of plaintiff-assured. His testimony was as follows:

"Q. I want to show you, Mr. Levinson, a Unit Control card which has a number 20019 and refer you to a series of letters thereon marked 'code,' and I want to ask you to identify for us what those letters represent.

"A. Those letters represent the letter substitution code, the acquisition cost of the merchandise.[1]

"Q. Is there a figure on this card showing any value that you have put upon this merchandise?

"A. The sales price is shown in figures on the card.

---

1. The evidence does show the numerical equivalent for the letters "IMLBM," but not why a code was used to record the acquisition cost of each item. Since only the aggregate cost of all 306 items is pertinent to a decision in this case, and that figure is established by the evidence and stipulation, the number-letter equivalents are not mentioned here.

"Q. And what is there that will enable us to know what figure is the sales price?

"A. The letters 'SP' immediately preceding it.

\* \* \* \* \* \*

"Q. What is the sales price figure?

"A. It originally was written on the card as $347.50, and that has been struck out and changed to $397.50.

"Q. Can you tell us why that change was made?

"A. From time to time, when we review the merchandise in stock and consider the value of the merchandise on the current market, the sales price is adjusted to reflect the sales value on the market . .

\* \* \* \* \* \*

"Q. Could you on July 23, 1973 replace that particular stock for less than what you call the sales price?

"A. Yes, sir. That sales price is the price for which we propose to sell it to our customer, and we could have bought it from our suppliers for some price somewhat less than that.

\* \* \* \* \* \*

"Q. Can you tell me when you bought it from this record?

"A. Yes, sir. The card shows that it was purchased August the 22nd, 1972."

Defendant contends, and plaintiff's witnesses concede, that at no place on the Unit Control cards, or other place in plaintiff's books or records, do figures appear which purport to state the current replacement cost of the 306 diamond items in issue. Therefore, the insurance company contends that the "exact amount" of the replacement cost cannot "be accurately determined [from the Unit Control cards] by the Company", as required by paragraph 8(A), and that plaintiff's recovery is limited to the lessor of the two figures stated on the face of the cards. The essence of its argument is that unless the replacement cost can be ascertained from writings previously "put upon" the face of the cards the recovery is limited to the lesser of the two figures appearing thereupon.

Plaintiff contends that the phrase "put upon" in paragraph 9(A) does not refer to the statement of acquisition cost on the Unit Control cards. That argument is predicated upon the theory that "put upon" refers to an evaluative act by plaintiff. Plaintiff's statement of the amount of the acquisition cost is merely a statement of what it did in fact pay. No judgment by plaintiff was required to arrive at that figure. Thus, the only figure "put upon" the diamonds, appearing on the Unit Control cards, was the sales price. No contention is made but that the recovery claimed by plaintiff is less than that price.

Plaintiff further contends that the requirement in Paragraph 8(A) that assured maintain a sufficiently detailed inventory that "the exact amount of loss can be accurately determined therefrom by the Company" requires only that the number, identity and characteristics of the items lost be capable of being determined from the inventory, and that the inventory provide sufficient information to enable a determination of the actual cash value at the time of the loss. In this connection, plaintiff did offer the testimony of three witnesses[2] which showed that replacement cost can be readily calculated from the acquisition cost and the records of price increases shown by the published price lists of the plaintiff's suppliers of diamonds. This testimony served two purposes at the time it was offered: first, to establish the replacement cost, and, second, to show the method by which replacement cost can be ascertained from the data recorded on the Unit Control cards. Since the amount of replacement cost was stipulated, the first purpose is no longer relevant. This testimony is still significant for the second purpose for which it was introduced.

■ We are persuaded that the interpretation plaintiff has placed upon the terms "put upon" and "exact amount of loss" are correct. The least that can be said is that those interpretations are sufficiently

2. Its president and two diamond merchants who were qualified as expert witnesses.

plausible to invoke the well established rule that ambiguities in a policy of insurance are to be resolved in favor of the assured and against the insurance company. *Rowe v. United States Fidelity and Guaranty Company,* 375 F.2d 215, 220 (4th Cir. 1967); *Lipscombe v. Security Insurance Co. of Hartford,* 213 Va. 81, 189 S.E.2d 320 (1972); *Ayres v. Harleysville Mutual Casualty Company,* 172 Va. 383, 389, 2 S.E.2d 303 (1939). Thus, we hold that the district court committed error in entering a judgment based upon plaintiff's acquisition cost rather than the stipulated amount of replacement cost at the time of the loss. A contract of insurance is a contract of indemnity. Only by reimbursing plaintiff by an amount sufficient to replace the lost items may it be considered that plaintiff has been truly indemnified.

As standard as is the iron safe clause, no case has been cited which involves the problem here presented. We are assured by counsel that there is no published decision involving this issue. Seven decisions involving iron safe clauses have been cited by the parties. Two cases were cited affirmatively in both briefs: *Dickerson v. Franklin National Insurance Company,* 130 F.2d 35 (4th Cir. 1942), and *Scottish Union Insurance Co. v. Virginia Shirt Co.,* 113 Va. 353, 74 S.E. 228 (1912). Plaintiff cited and defendant distinguished *Balogh v. Jewelers Mutual Insurance Co.,* 167 F.Supp. 763 (S.D. Fla.1958).[3] Plaintiff also cited *Houff & Holler v. German American Insurance Co.,* 110 Va. 585, 66 S.E. 831 (1910). In addition to the cases cited by both parties, defendant has cited *Hartford Fire Insurance Co. v. Farris,* 116 Va. 880, 83 S.E. 377 (1914), *Phoenix Ins. Com. v. Sherman,* 110 Va. 435, 66 S.E. 81 (1909), and *Jonette Jewelry Co. v. Liberty Mutual Insurance Co.,* 105 R.I. 308, 251 A.2d 521 (1969). The issue involved in those cases was whether or not the iron safe

clause was complied with. Since it has been stipulated in the case now under consideration that plaintiff's unit control cards constitute compliance with Paragraph 8(A), they are not directly applicable. *Scottish Union Ins. Co. v. Virginia Shirt Co.,* supra, is helpful, however, because the court explains the purpose for including such a clause. At 113 Va. page 361, 74 S.E. p. 231, the court states:

> "The authorities uniformly sustain the validity of the iron-safe clause in an insurance policy, on the ground that its provisions, requiring itemized inventories and a set of books, 'clearly and plainly presenting a complete record of business transacted,' provide check upon fraud, and by a compliance therewith a means of ascertaining with reasonable certainty the amount of goods on hand would be forthcoming. This iron-safe clause is a reasonable stipulation in the contract, fair alike to the insured as well as to the insurer, and, if a loss by fire occurs and the insured is unable to show, at least, a substantial compliance with the requirements of his contract, he has no just cause to complain of his inability to reap its intended benefits."

It thus appears, as contended by plaintiff, that the main purpose of the clause is to protect the insurance company against claim of loss for items which may never have really existed. That tends to confirm plaintiff's contention that "exact amount of loss" in Paragraph 8(A) refers to the number and nature of items lost and not primarily to their value.

Defendant's contention, and the theory of the district court, may possibly be regarded as a sort of estoppel argument. In its brief, defendant argues:

> " . . . [T]he policy does not undertake to specify in any way the manner in

---

**3.** *Balogh* comes the nearest to being in point of any of the seven cited. There, the pertinent policy provisions were identical with paragraphs 8(A) and 9(A) of the policy here involved. The case was different in that goods plaintiff held on consignment were involved. In that sense, the case presented a problem similar to that of the customers' goods lost in

this case. The court did, however, predicate its basis for coverage on replacement cost. The insurance company's contention was that there was no evidence of said replacement cost. The court held that it could be presumed that the figure at which the goods were consigned would constitute said replacement cost.

which the records required are to be kept by the insured, nor does it undertake to specify what values are to appear on the inventory. This is left entirely to the discretion of the insured. There is absolutely no requirement that the values shown on inventory be stated in terms of historical cost, in terms of replacement cost, in terms of market value, or in terms of selling price. The insured is left free to adopt any inventory method it chooses. In the instant case Brand chose to record two values on its perpetual inventory records, *historic cost* and selling price." (Emphasis counsel's)

In a similar vein, the district court states: "But here, we have an inventory showing the items and the value of each item. Plaintiff has chosen to adopt the cost price of each item as its inventory value except where market value was less. . . ."

The thrust of this argument seems to be that plaintiff would have been on firm ground had it only placed its estimate of replacement cost upon its unit control cards, either in lieu of or in addition to the other two items.

If the realities of the situation be considered, the recording of a replacement cost would have served little useful purpose. That item is significantly different from the other two recorded on the unit control cards. Acquisition cost is a definite figure subject to no element of judgment and to no variation. So far as significant, no proof is necessary beyond accepting the veracity of the person making the record. Sales price is an item that can be neither proved nor disproved to a certainty. It expresses only the desire or objective of the person making the entry. Replacement cost, on the other hand, is a matter of deduction. It is a matter which must be determined when it is pertinent, i. e., when a loss occurs. It is inconceivable that an insurance company would accept a notation of its assured's conclusion of replacement cost, made some time before loss. It would still require proof, much as was used in the trial in this case. What the iron safe clause requires is that there be a record of such specific information available from which may be determined replacement cost, when a determination is required. That information is provided in part by the record of the acquisition cost. Such acquisition cost is one factor, but not the only factor in determining replacement cost. But it is the only factor other than a description of the item that can feasibly be recorded prior to the occurrence of loss.[4]

■ Defendant's theory is self refuting. To demonstrate this conclusion, we should consider, in addition to Paragraphs 8(A) and 9(A), Paragraph 13 of the policy,[5] which provides, in pertinent part:

"13. Nature and Proof of Loss. In the event of loss or damage, . . . the assured shall give immediate notice to the company, . . . furnish a complete list of all lost or damaged property *stating the market value and cost* of each article and the amount claimed thereon; and the assured shall within sixty (60) days after loss . . . render the company a proof of loss . . . stating the knowledge and belief of the assured as to the following: . . . the cash value of each item thereof, . . . ." (Emphasis supplied).

4. The unit control cards, which were immediately filled out when an item was brought upon the premises, and stipulated to be a compliance with Paragraph 8(A) of the policy, contain the following information to a person familiar with the cards: a diamond control number which was affixed to the respective item of merchandise; the retail selling price; the original acquisition cost; the name of the supplier; a cross-reference to the original supplier's invoice; the date stocked; and a description or sketch of the item.

5. Plaintiff and defendant agree that contracts, including insurance policies, must be considered as a whole, and that, in construing any clause of a policy related clauses must also be considered. Plaintiff cites *Carpenter v. Gate City*, 185 Va. 734, 40 S.E.2d 268 (1946), and defendant cites *Quesenberry v. Nichols*, 208 Va. 667, 159 S.E.2d 636 (1968), for that proposition.

Thus, it is necessary that acquisition price be stated to the company. Market value can be determined at the time of loss, but the cost, i. e., acquisition price, can only be obtained from the assured's records or by referring to them. Thus, it is essential for the assured, to be able to comply with Paragraph 13, that it keep a record of what it paid for each article, such as was kept on plaintiff's unit control cards. If the record of original cost be regarded as a figure "put upon" the items insured, it would of necessity limit recovery because, in an inflating market such as we now have, the acquisition cost would always be less than the replacement value. Nowhere in the policy do we find language intended to limit replacement cost or "actual cash value" to recorded acquisition cost unless a current written entry of the fluctuations of the diamond market were entered in its books by the assured.

■ Undoubtedly, an insurance company may limit its coverage to the original cost of the property insured. But when it is considered that a policy of insurance is a contract of indemnity, and that replacement cost, or actual cash value, is the standard for coverage, a policy should not be construed as limiting coverage to acquisition cost unless such an intention is clearly stated. A contrary conclusion could make the policy a trap for unwary assureds. An intention to so limit coverage should not be inferred in a roundabout way by piecing together clauses of the policy intended for other purposes. Nowhere, for example, does the insurance company contend that its policy will pay the original cost in a situation in which original cost is greater than replacement cost, such as would exist in a deflating market. We do not believe that it did so intend, or that it now intends its argument to support that position. But that is where the logic of the argument leads. Thus, defendant's theory proves too much and is self refuting.

Plaintiff offered the testimony of William R. Rodda, an insurance expert, who helped develop the jeweler's block policy involved in this case. An objection to his testimony, upon the ground that the meaning of the policy was a matter to be determined by the court, was sustained. Plaintiff, however, was allowed to examine the witness for the purpose of the record on appeal, and we are asked to consider such evidence despite the ruling of the district court. In view of the interpretation of the policy we have reached, without considering the Rodda testimony, it is unnecessary for us to pass on the admissibility of that evidence, and we express no opinion upon the question.

The judgment appealed from is reversed and the case is remanded to the district court with directions to enter judgment for plaintiff in the amount of $84,918.60 with interest thereupon from October 20, 1973.

*REVERSED AND REMANDED.*