**OCCIDENTAL PETROLEUM CORPORATION, Plaintiff,**

v.

**NEW HAMPSHIRE INSURANCE COMPANY, Centennial Insurance Company, United States Fire Insurance Company, Continental Insurance Company, Fireman's Fund Insurance Company, St. Paul Fire and Marine Insurance Company, Northwestern National Insurance Company, American Motorists Insurance Company, Highlands Insurance Company and American International Marine Agency of New York, Inc., Defendants.**

**No. 78 Civ. 2824.**

United States District Court, S. D. New York.

Jan. 30, 1981.

Kirlin, Campbell & Keating, New York City, for plaintiff; John P. Vayda, Richard H. Sommer, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants; Joseph J. Magrath, III, New York City, of counsel.

SOFAER, District Judge:

This case turns upon the proper construction of the terms of a marine insurance contract—a contract so ineptly drafted as to defy clear comprehension. Counsel have advanced various clever readings of the contested provisions, but the choice among the proposed meanings cannot turn solely on grammatical analysis; too many contrary readings are logically acceptable. The result, therefore, must turn on the background and purposes of this particular policy. Some consolation for the uncertainty that remains can be derived from the fact that a policy so infelicitously drawn is unlikely to plague the admiralty bar soon again.

Plaintiff Occidental Petroleum Corporation was the assured under a policy (J & H—JP—74/1013) issued by the defendant insurance companies. During the period covered by the policy, 146 pieces of casing (used to line oil wells) were lost while plaintiff was barging them from Iquitos, Peru to Teniente Lopez, Peru. The casing was to have been carried by helicopter from Teniente Lopez to the oil-drilling sites.

The parties agree that the loss was covered by the insurance policy, but they disagree as to the amount of the claim that defendants must pay. Plaintiff contends that, under Clauses 6(b) or 15 of the policy, it is entitled to the actual cost of purchasing and transporting replacement casing to the destination ($314,228.19, less $10,000 deductible)—referred to as "replacement cost." Plaintiff contends that, alternatively, it is entitled under Clause 6(a) to the cost of purchasing goods at the nearest available market and transporting them to the point of loss on the day that the goods should have arrived ($222,178.96, less $10,000 deductible)—referred to as "market value." Defendants contend that plaintiff is entitled only to the actual cost of acquiring and transporting the goods to the point of loss ($53.950, less $10,000 deductible, plus interest)—referred to as the "C. & F. Iquitos cost." Defendants also advance a conditional counterclaim, contending that, if plaintiff recovers more than the C. & F. Iquitos cost, it must recompute all premiums paid pursuant to the policy.

The parties have submitted the case to this Court for judgment "in lieu of a formal trial of facts," Plaintiff's Memorandum at 3, and have presented extensive stipulations of fact and exhibits. Neither party seeks to present live testimony on any issue. The precedents cited by the parties are of little use, for generalities cannot control the interpretation of these peculiar provisions. On balance, defendants' interpretation of the policy (supported by an especially capable brief) is the more reasonable one. Plaintiff is entitled to recover the C. & F. Iquitos cost. No need exists, therefore, to

reach defendants' conditional counterclaim. This opinion constitutes the Court's findings of fact and conclusions of law.

The policy in question is a "valued" policy, and Professors Gilmore and Black's discussion of such policies is instructive:

> Most marine insurance policies are "valued." This means that the assurer and the assured have agreed in advance on the total value of the insured subject matter. In the absence of fraud, concealment or an intent to wager, *this stipulation is binding on both of them, whatever the true worth of the insured property may be.* The "valuation" is to be distinguished carefully from the "sum insured"; it is entirely possible that a policy may be written valuing a ship at $1,000,000, but insuring only $500,000 of that amount.
>
> The bindingness of the valuation has many consequences. The most obvious is that, where the valuation and the insured sum are the same, that amount is the amount payable in the event of a total loss, regardless of "actual value" at the time of loss or at any other time. Where the insured sum is, say, only one-half of the stipulated value, the underwriter pays only the insured sum; the assured may have to make up the difference out of his own pocket, or there may be other policies in force.
>
> The practice of "valuation" may, of course, turn out in the event to be advantageous to one party or the other, depending upon whether an over- or an under-valuation is stipulated for, *and on the trend of the market between the issuance of the policy and the loss.* But the courts have firmly refused to allow the chance hardship or windfall to produce an exception to the binding effect given to the valuation. The practice of valuation, supported by this firm judicial attitude, is of high utility; it obviates the necessity of wrangling, in or out of court, over matters that are notoriously difficult of ascertainment.

G. Gilmore & C. Black, *The Law of Admiralty* § 2–16, at 86–87 (2d ed. 1975) (emphasis added) (footnotes omitted).

The policy was also an "open" policy, covering not a single shipment, but rather all future shipments. Because the policy was valued and open, it necessarily contained a provision for ascertaining the insured value of each shipment. That provision was Clause 6:

> 6. Valued at amount of invoice, including all charges therein, including any prepaid and/or advanced and/or guaranteed freight, plus 10% until declared and then at amount declared, provided such declaration is made prior to any known or reported loss or accident, but in no event to be less than the foregoing.
>
> Notwithstanding the above, the following valuations shall apply where applicable:
>
> (a) Market value at destination on the first market day following completion of discharge or in the event of non-arrival of the vessel the market value on the date which the vessel should have arrived.
>
> (b) cost, or
>
> (c) sales price, plus prepaid and/or advanced and/or guaranteed freight payable "vessel lost or not lost", if any, and all other charges not included in the sales price plus the percentage of advances, if any, required by purchaser, whichever is greater of (a), (b) or (c) above.

Plaintiff's claim rests on bifurcating Clause 6: it contends that the first paragraph prescribes valuation for purposes of premium payments, while the three alternatives prescribe valuation in event of loss. Plaintiff claims that it sought full indemnity and that it intended Clause 6 to provide it with the greatest possible recovery. Plaintiff relies upon the testimony of Peter J. Fogarty, an employee of Johnson & Higgins, the insurance broker that plaintiff commissioned to draft the policy; Fogarty was one of the draftsmen.

Plaintiff's parsing of Clause 6 is unpersuasive. Nothing in the language of the clause suggests that different valuations will be used for premiums and for recovery. The following statements by Fogarty under cross-examination illustrate the implausibility of plaintiff's interpretation.

Q. Is there anything in paragraph six that indicates that one of the four valuations is for premium purposes only?

A. Not that I can see in and of itself.

Q. Is there anything in clause six that says any of the other valuations are for loss purposes only and not for premium purposes?

A. I think that "notwithstanding the above, the following valuations shall apply where applicable."

Ex. 3 at 49–50. Similarly, when asked "[i]s there anything in the clause on which you base [your interpretation of Clause 6]," Fogarty replied: "[t]here is nothing specific which says ... the first paragraph relates to premium, the next three relate to claims, other than the stipulation that 'notwithstanding the above, the following valuations shall apply where applicable.'" Ex. 3 at 38.

Fogarty's testimony is unpersuasive. Fogarty never claims that he and defendants' agent negotiated over a variance between premium and loss valuation. In fact, when asked whether defendants' agent (now deceased) had shared his interpretation of Clause 6, Fogarty's reply was ambiguous: "I believe that the policy was reviewed in depth by the underwriter, who clearly knew the concept of bulk reporting, and that there can be a difference between the basis on which you pay premium and the basis on which you collect the losses." Ex. 3 at 60. To say that a party knew that there could be a variance between premium and loss valuation is not to say that the party agreed to such a variance.

This is not a case in which an ambiguous but plausible interpretation is supported by custom in the trade. Fogarty himself testified that prevailing industry practice was contrary to plaintiff's interpretation.

Q. In the great majority of ocean marine cargo policies, the amount payable by the underwriter in case of loss, in case of a total loss, is based upon just such a formula set forth in the first paragraph of clause six, isn't it?

A. In most cargo policies, the premium payment and the loss valuation are the same, and generally, it is CIF plus 10.

Ex. 3 at 40. Fogarty's attempts to overcome that practice are not convincing.

Q. There is nothing here anywhere in this policy that says that the insured value for purpose of premium and the insured value for purpose of loss shall be different?

A. I think it's implied, and I think that in fact, it does say it.

Q. Any words you can point to?

A. "Notwithstanding the above, the following valuation[s] shall apply where applicable." The wording suggests to me that valuation will be A, B or C.

Q. The word "applicable" means in case of loss?

A. Applicable in case of loss, that is correct.

Ex. 3 at 40–41.

Were plaintiff's interpretation correct, then the premium rates contained in Clause 33 of the policy would presumably be substantially higher than in policies that use the same valuation for premium and loss. An assurer would presumably charge more if he was paid on one valuation but might have to pay out, at the assured's option after an accident, on a much higher valuation. Yet plaintiff does not suggest that it paid higher rates than did comparable assureds to receive such extraordinary protection.

Fogarty—plaintiff's agent—was a draftsman of the policy. If, as he now claims, the phrase that introduces the alternative valuations—"shall apply where applicable"—meant "in case of loss," then he should have drafted the clause accordingly.

The transition sentence in Clause 6 standing alone, is tautological: to say that the alternative valuations "shall apply where applicable" offers little guidance. But the sentence does make sense when construed in conjunction with Clause 33 of the policy. Clause 33 provides that the amount of premium that the assured must pay will be determined by multiplying specified rates against "the actual total insured value declared" in the annual report to the assurers.

Clause 33 is not ambiguous: it clearly establishes that the greater the insured value of the assured's shipments, the greater the premium it must pay (unless the actual total is within ten percent of the preliminary deposit).

When Clauses 6 and 33 are read in conjunction, the likely intent of the parties emerges. The insured value—upon which both premium and recovery are based—will ordinarily be the invoice amount (plus charges and ten percent). Clause 6 gives the assured the option, however, of declaring a different value, "provided such declaration is made prior to any known or reported loss or accident, but in no event to be less than the foregoing." Should the assured prefer an alternative insured value, then it must determine which of the three specified options is applicable and then choose the greatest from among them. But, pursuant to Clause 33, the assured must pay premium on whichever insured value it chooses. Significantly, a draft binder of the policy contained, in place of the phrase "Notwithstanding the above, the following valuations shall apply where applicable," the single word "Alternatively." Ex. 51. Fogarty conceded that "alternatively" simply meant "or" and did not imply that premiums would be computed on one valuation and losses paid on another. Ex. 3 at 41–42.

Given this understanding of the relevant clauses, it becomes clear that plaintiff may only recover its invoice cost plus charges. Clause 6, paragraph 1, requires the assured to declare an alternative value "prior to . . . loss or accident." Yet with respect to this particular shipment, plaintiff never reported any value, either before or after loss. Stipulation of Facts ¶ 39. Moreover, plaintiff concedes that if it had reported the shipment (as required by Clause 33), it would have reported the acquisition cost— the same valuation upon which it reported all other shipments under the policy. Stipulation of Facts ¶¶ 36, 40. Plaintiff consistently treated the insured value of its cargo as the invoice cost, and it cannot recover more than that amount.

Even if plaintiff were correct and the alternative valuations were applicable only to losses, plaintiff should not recover a greater amount. Clause 6 lists three alternatives and directs that whichever of the three is "greater" [sic] should be used. Alternative (c) is patently inapplicable: this loss did not involve the sale of property to a customer. Plaintiff does not argue otherwise.

Plaintiff relies primarily upon valuation alternative (b), "cost," insisting that that term means "replacement cost." This interpretation is unreasonable. Plaintiff urges that the term be interpreted "in light of an average person's understanding." The normal meaning of cost is acquisition cost; when a person means "replacement cost," he specifies that. Significantly, in Clause 15, the parties did expressly refer to replacement cost when they meant something other than the original cost of acquisition.

The history of this policy also repudiates plaintiff's interpretation. On February 15, 1974, Fogarty's fellow draftsman at Johnson & Higgins, Charles Henshall, sent a draft policy to one of the defendants containing a valuation clause identical to Clause 6. Ex. 57 at 2. On April 8, another Johnson & Higgins employee sent a memorandum to Fogarty asking whether the assurers would agree to pay replacement cost, if the premium valuation were raised to CIF plus 15% to 20% or 25%. Ex. 53. A note in the company's files dated March 20 made the same suggestion. Ex. 55 at 2. Fogarty replied that "underwriters have indicated that they would not be agreeable to a replacement cost claim payment without a market valuation clause. CIF + 25% advance might be adequate, but only if it is periodically revised." Ex. 54 at 1. Thus, defendants expressly rejected replacement cost; the valuation clause was not amended to incorporate plaintiff's proposal.

Defendants' position is far more plausible: they contend that they intended for premiums and claims to be calculated on the basis of the same valuation. To the extent that plaintiff reported valuation for

purposes of premium, it did so in terms of acquisition cost. Nothing in the policy itself, and no credible evidence as to its negotiation, establishes that defendants agreed to deviate from what even Fogarty concedes was the normal course—namely, the same method of valuation for both purposes. Thus, "cost" must be interpreted to mean original cost, not replacement cost.

Plaintiff claims, alternatively, that it is entitled to replacement cost under the "machinery clause," Clause 15:

15. On shipments of machinery or other manufactured products, consisting when complete for sale or use of several parts, the liability of these Assurers is limited to the insured value of the part or parts lost or damaged, or, at Assured's option, the cost and expense of replacing or duplicating the lost or damaged part or parts, and/or the repairing of the machine or product.

Clause 15 is inapplicable to the shipment of these pipe casings. The purpose of the clause is to enable the assured to replace lost or damaged parts of a machine, even though the cost of such replacement is greater than the value of the particular part in proportion to the overall value of the entire machine. For example, the cost of replacing a broken wheel on a railroad car could far exceed that wheel's proportionate value; Clause 15 seeks to enable the assured to repair the entire car. The clause would not apply, however, to a shipment composed solely of railroad car wheels. These casings, although ultimately intended for use in combination with each other, cannot fairly be brought within Clause 15. Thus, plaintiff is not entitled to replacement cost under Clause 6(b) or Clause 15.

Plaintiff argues, finally, that it is entitled to market value under Clause 6(a). The parties agree that no purchases or sales of casing were made in Peru at the time of loss; all casing used in Peru was purchased abroad. Stipulation of Facts ¶ 10. Thus, there was no market for casing *in Peru* and technically no "market value at destination." If the phrase "shall apply where applicable" means anything, it means at least that plaintiff cannot recover market value when no market value exists at the particular destination.

Plaintiff urges that this Court should nevertheless award it the cost of obtaining the casing at the nearest port and then transporting it to the Panamanian destination. This argument is superficially appealing, for some cases do indeed employ such a computation. But, upon closer examination, the authorities cited by plaintiff do not control here. Those cases do not involve marine insurance policies or clauses in such policies that expressly refer to "market value at destination"; nor do they contain more than a passing discussion of the rationale for their decisions. Absent a provision like that contained in this policy, courts do sometimes construct an artificial market value when no market exists at the destination; but that substitute measure of damages is not the same as market value at destination. Plaintiff points to nothing in the negotiations to suggest that the parties agreed to accept an artificial substitute when no market existed at the destination. Clause 6(a) can come into play only when a market exists at destination, and, in its absence, remits the assured to another measure. A strict reading of the clause is appropriate. An insurance policy that permitted recovery on a value different from the value stated for purposes of establishing the premium would be inconsistent with normal practices in the trade. Assuming that a policy is so construed, then the insurer should be held to have agreed to such variances in value only to the extent that the language specifically provides. Otherwise, the insurer's additional risk would be open-ended and entirely uncertain.

A recent decision in this district is instructive. In *Tatlow & Pledger (PTY) Ltd. v. Hermann Forwarding Co.*, 456 F.Supp. 351 (S.D.N.Y.1978), Judge Duffy stated: "It is true ... that the ordinary measure of damages in a case such as this is the price the property would have brought in the market at its destination point less freight charges .... However, where, as here, the market value has not been shown, and an-

other measure of damages is available, I do not believe it improvident to adopt that alternate means of determining damages." *Id.* at 355. The court used "the invoice value of the lost goods at the point of shipment" as the appropriate measure of damages. *Id.*

With respect to all of the contested clauses, plaintiff repeatedly demands that the policy be construed against the assurers. Plaintiff cites inapposite cases for the general proposition that an assured is entitled to full indemnity.[1] As discussed above, this is a valued policy, and plaintiff knew that it might not recover fully its actual loss. The Supreme Court has stated with respect to such policies: "[t]he agreed value, honestly arrived at, thus stands in the place of prime value under an open marine policy . . . and resembles, in its practical operation, a stipulation for liquidated damages." *Aetna Insurance Co. v. United Fruit Co.*, 304 U.S. 430, 434, 58 S.Ct. 959, 960, 82 L.Ed. 1443 (1938). As Professors Gilmore and Black observe, "the courts have firmly refused to allow the chance hardship or windfall to produce an exception to the binding effect given the valuation." G. Gilmore & C. Black, *supra*, § 2–16, at 87. This is not a case of disparity in either bargaining power or expertise between assurer and assured. It was plaintiff's agent, moreover, that drafted the policy. Stipulation of Facts ¶ 1. If plaintiff hoped to pay premium on acquisition cost but to recover replacement value, then it should so have provided in the contract.

Plaintiff has failed to sustain its burden of proof. Accordingly, plaintiff is entitled to receive C. & F. Iquitos Cost, $53,950, less $10,000 deductible, plus interest. Plaintiff will submit judgment within five days.

So ordered.

---

1. For example, plaintiff makes much of the decision in *Brand Distributors, Inc. v. Insurance Company of North America*, 532 F.2d 352 (4th Cir. 1976), which required the insurer to pay replacement cost. That particular policy, however, expressly provided that "loss or damage shall be estimated according to such actual cash value," and the court equated the term "actual cash value" with "replacement cost." *Id.* at 359.